IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| Sam Frederick, ) | CIVIL ACTION NO. 2:15-2699-MGL-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **REPORT AND RECOMMENDATION** |
| United States of America, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This action has been filed by the Plaintiff, pro se, pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, et. seq.. Plaintiff is an inmate with the Federal Bureau of Prisons, currently housed at the Federal Correctional Institution in Coleman, Florida. At the time Plaintiff filed this action he was confined at the Federal Correctional Institution in Butner, North Carolina, but the claims that give rise to this action occurred while Plaintiff was housed at the Federal Correctional Institution in Edgefield, South Carolina.

The Defendant filed a motion to dismiss or for summary judgment on November 30, 2015. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on December 1, 2015, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendant's motion may be granted, thereby ending his case. After receiving several extensions of time, Plaintiff filed a response in opposition to the Defendant's motion on February 23, 2016.



The Defendant's motion is now before the Court for disposition.[1]

## Background and Evidence

Plaintiff alleges in his Verified Complaint[2] that while in the custody and care of the Bureau of Prisons he reported to a physician's assistant (Ryan) on January 30, 2013 for an "open wound complaint". Plaintiff alleges that the following day, January 31, 2013, he returned (apparently to medical) for a "dressing change", where the Nurse (Adams) said he had a skin tear to his right great toe. Plaintiff thereafter lists chronologically the care and treatment he received for this injury/condition through May 31, 2013 (totaling, according to the Complaint, forty-seven (47) medical visits during that four (4) month time period). See Complaint, pp. 4-7. Plaintiff alleges that the Defendant was negligent and grossly negligent in addressing his medical condition, and that the Defendant's misdiagnosis of his condition and delayed treatment of his great right toe resulted in him "losing his great right toe needlessly". Plaintiff seeks monetary damages. See generally, Plaintiff's Verified Complaint.

In support of summary judgment in the case, the Defendant has provided as exhibits copies of some four hundred twenty (420) pages of medical records detailing the medical care and treatment Plaintiff has received. The Defendant has also provided an affidavit from R. A. Blocker, a licensed physician in South Carolina and the clinical Director at FCI Edgefield, where Plaintiff was

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendant has filed a motion to dismiss or for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the factual allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



housed. Dr. Blocker attests that he is responsible for overseeing the medical care provided to inmates at FCI Edgefield, and that he is familiar with the Plaintiff, who was incarcerated at FCI Edgefield from June 13, 2012 through August 15, 2013.

Dr. Blocker attests that when Plaintiff arrived at FCI Edgefield on June 12, 2012, he had an initial health screen which noted several medical problems, including diabetes mellitus. Plaintiff did not voice any complaints or concerns about wounds on his toes at that time. Dr. Blocker attests that he thereafter saw the Plaintiff on June 20, 2012 in the chronic care clinic, where Plaintiff reported a history of diabetes since 2000, and that he had been on insulin since 2005. Labs were ordered, and Plaintiff was counseled on the importance of complying with treatment and his plan of care. Plaintiff was thereafter seen by medical staff on June 28, 2012 for a complaint of blisters on both great toes. No signs or symptoms of infection were noted, the blisters were debrided, and Acticoat and sterile dressings were applied. Plaintiff was seen for followup the following day, where his toes were cleaned and ointment and band-aids were applied. Again, there were no signs or symptoms of infection.

Dr. Blocker attests that Plaintiff was seen again by medical staff on July 3, 2012 for cleaning and a change of band-aids, at which time there were again no signs or symptoms of infection. Medical staff noted that Plaintiff was non-compliant with diabetic control and he was counseled on the importance of compliance with treatment and on how to access care. Dr. Block attests that Plaintiff received another follow-up on July 10, 2012, and that by July 7, 2012 examination by medical staff found that the wounds to both great toes were essentially healed with no signs or symptoms of infection. Plaintiff was instructed on a treatment plan, which included advice to purchase some lotion from the commissary for use on his feet daily.

3



Dr. Blocker attests that Plaintiff continued to be seen thereafter by medical staff for other medical issues, but that Plaintiff did not again complain about any wounds on his great toes until December 27, 2012, when he was seen at sick call about a callous on his right great toe that he had "picked off". Plaintiff's wound was cleaned and dressing was applied. Dr. Blocker attests that Plaintiff did not thereafter return to medical again until a month later, on January 30, 2013, where he complained that an area on his great right toe had "busted". Examination revealed that Plaintiff's right great toe had a linear wound with a pink base, with no malodor or drainage noted. Plaintiff's wound was cleaned, and Acticoat and sterile dressings were applied. It was also noted that Plaintiff was again non-compliant with his insulin regimen. Plaintiff was thereafter seen by medical staff ten (10) times over the next twenty days for wound care on his right toe. By March 1, 2013, examination of Plaintiff's great right toe revealed that the wound had essentially healed. Medical staff again noted on that date that Plaintiff was non-compliant with insulin and "all other medications". Plaintiff's medications were renewed, and he was again counseled on how to access care and of the importance of compliance with his treatment plan.

Dr. Blocker attests that Plaintiff was seen on March 15, 2013 for a follow-up, at which time examination revealed his right great toe had callous formation and no signs or symptoms of infection or cellulitis. Dr. Blocker attests that medical staff removed Plaintiff's callous, trimmed his toenail, cleaned his wound, and applied Acticoat, following which he was instructed to return for follow-up examination the next week. When Plaintiff was seen again by medical staff on March 18, 2013, examination of his right great toe revealed the wound was essentially healed with no open areas or wounds. Plaintiff was advised to use lotion on his feet three times a day and return to the clinic as needed.

4



Dr. Bocker attests that Plaintiff was seen by medical staff on April 9, 2013 for a complaint of an open wound on his right great toe. Examination revealed a wound on his great right toe with signs of infection and with a scant amount of drainage. The wound was cleaned, conservatively debrided, Acticoat and sterile dressings were applied, and Plaintiff was prescribed an antibiotic. Plaintiff was thereafter seen for follow-up wound care on numerous occasions over the course of the next few weeks, during which Plaintiff also had blood work, x-rays, and wound cultures taken for laboratory testing. On April 17, 2013 medical staff noted that Plaintiff's wound was improving. On May 6, 2013, lab results revealed that Plaintiff had a staff infection that was resistant to the antibiotic he was on, which was then discontinued and replaced with another medication.

Dr. Blocker attests that Plaintiff continued to be seen thereafter for wound care, including a radiological consult being requested on May 12, 2013. Dr. Blocker attests that he personally counseled Plaintiff on May 15, 2013 on the effects of wound healing and the compliance with taking insulin. A consultation was also written at that time to have Plaintiff examined by the consultant general surgeon during his next visit to the institution. Plaintiff thereafter continued to be seen at regular intervals (daily between May 19 and May 22, 2013), culminating in Plaintiff being evaluated by the consultant general surgeon on May 22, 2013. An x-ray was also taken of Plaintiff's right foot, and it was recommended that Plaintiff be examined by an orthopedic surgeon for further treatment.

Dr. Blocker attests that x-ray results from May 23, 2013 revealed soft tissue swelling with internal erosive changes and tiny fragments of bone in the distal tip of the great toe consistent



with a history of osteomyelitis.[3]  Plaintiff was thereafter seen four more times (daily from May 25, 2013) through May 28, 2013, when Plaintiff presented to medical staff advising that he had removed, on his own, two of his toenails from his right foot because they were pressing in his shoes when he walked.  Dr. Blocker attests that medical staff stressed the dangers of getting infections in those toes and obtained a culture for sensitivity laboratory testing.  Plaintiff was thereafter seen every day for the next three days.

Plaintiff was advised by medical staff on May 31, 2013 that his lab results revealed he had a Citrobacter Freundil complex[4] and Methicillin Resistant Staphylococcus aureus infection.  Plaintiff's antibiotic treatment was renewed.  Dr. Blocker attests that Plaintiff was seen again by medical staff for wound care on June 2, 2013, and because Plaintiff's wound was showing no improvement, he was transported to the local community hospital for evaluation by a surgeon and a Doppler study to rule out sepsis and a determination of whether intravenous antibiotics were needed.  Dr. Blocker attests that x-rays performed at that time revealed destructive changes of the entire distal phalanx of the great toe indicating osteomyelitis, with the infection being localized to the distal phalanx great toe with no apparent boney involvement of the proximal phalanx.  Dr. Blocker attests that Plaintiff was admitted to the hospital surgical floor with the plan of treatment being to amputate the right great toe.  Plaintiff thereafter underwent surgery the following and his right great toe was amputated.  Plaintiff stayed in the hospital until June 17, 2013 due in part to his

---

[3]Osteomyelitis is an infection in a bone.  http://www.mayoclinic.org/diseases-conditions/osteomyelitis/basics/definition/con-20025518, September 25, 2015.

[4] A bacterial species found in water, feces, and urine; it is an inhabitant of the normal intestine, but it may occur in alimentary infections and in infections of the urinary tract, gallbladder, middle ear and meninges.  http://medical-dictionary.thefreedictionary.com/Citrobacter+freundii



uncontrolled insulin dependant diabetes mellitus, which required a wound vac device to aid in healing post operatively. Dr. Blocker attests that during this time Plaintiff received intravenous antibiotics to prevent and control infection as well as medication for pain.

    Dr. Blocker attests that Plaintiff returned to the institution on June 17, 2013, where he was prescribed medications in accordance with the recommended prescriptions from the local hospital and the BOP National Formulary list. Plaintiff was thereafter seen for follow-up care on nine occasions through July 5, 2013. Dr. Blocker attests that he saw the Plaintiff on July 8, 2013, with his examination revealing Plaintiff's wound was healing slowly. Between July 8, and July 17, 2013, Plaintiff was seen by medical staff for wound care an additional five times. Plaintiff was also seen by the general surgeon on July 17, 2013.

    Dr. Blocker attests that on July 23, 2013, in accordance with the recommendation of the doctor at the local hospital, Plaintiff was taken to a wound care clinic to see a specialist for a follow-up evaluation. Examination revealed granulation tissue was healthy in appearance, although the specialist assessment was that Plaintiff had a non-healing surgical wound. Plaintiff's wound was debrided and cleaned, and the wound vac machine was placed back over his wound. The specialist opined that a Apligraf might be necessary in the future to help speed up the healing process. Dr. Blocker attests that he thereafter saw the Plaintiff on July 24, 2013, at which time he noted that Plaintiff's chart review revealed that he had missed eight doses of his p.m. insulin for July 2013. Dr. Blocker ordered new labs and instructed Plaintiff to follow-up as needed and return immediately if his condition worsened. Dr. Blocker attests that a review of Plaintiff's commissary receipts showed that he was still eating foods that were high in sugar and contrary to what he should be eating as a diabetic. Plaintiff was again counseled on compliance with treatment. Plaintiff was thereafter



seen by medical staff for wound care on numerous occasions over the course of the next month.

Dr. Blocker attests that on July 30, 2013 he made an official request that Plaintiff be transferred to the Federal Medical Center (FMC) because he required long term care (LTC). Dr. Blocker referenced Plaintiff's numerous medical diagnoses, along with his poor compliance with diabetic treatment, and opined that because of Plaintiff's need for increased monitoring and nursing care he was now considered a Care Level 3 inmate. Dr. Blocker attests that on July 31, 2013, the Medical Designator Office of Medical Designations and Transportation Center Office approved Plaintiff being moved to the FMC in Butner, North Carolina.

Dr. Blocker attests that during his wound care appointment on August 11, 2013, Plaintiff told medical staff that he wanted the wound vac machine taken off because he was tired of it, but that medical staff informed him of the importance of dressing/machine needing to stay on. Dr. Blocker attests that the following day, medical staff decided to take the wound vac machine off and leave it off at least for the night since it was not staying on the wound like it should, but indicated that a decision would need to be made the next day as to what to do for the remainder of the week in regard to the wound vac machine. Dr. Blocker attests that the following day, August 13, 2013, he made an administrative note concerning a discussion he had had with Plaintiff's wound care specialist, who anticipated that the wound vac machine would be discontinued at his next visit. Dr. Blocker attests that he noted that Plaintiff was scheduled to be transferred to the FMC soon, and a decision was made to discontinue the wound vac machine at that time, with the new institution being advised of the situation and that they would re-evaluate whether Plaintiff would need another wound vac machine to be reapplied. Dr. Blocker attests that Plaintiff was thereafter transferred to FMC Butner on August 15, 2013, where he underwent completion of antibiotic treatment aggressive



wound care to include regular sharp debridement. Dr. Blocker attests that once Plaintiff was discharged from the rehabilitation services and orthopedic services at FMC Butner, his care level dropped to a Care Level 2, and he was transferred to FCI Coleman Low on July 2, 2015, where he is currently incarcerated.

Dr. Blocker attests that from the time Plaintiff first complained about a wound on his right great toe to medical staff on December 27, 2012 until he was transferred to FMC Butner, Plaintiff received medical treatment for his right great toe on approximately seventy-four (74) different occasions, including but not limited to regular evaluations by medical staff; clinical encounters; administrative notes, renewal of medical; evaluations by different specialists; local hospital treatment; amputation of his right great toe; and post surgical care by specialists and FCI Edgefield medical staff. Dr. Blocker attests that there is no evidence that medical staff at FCI Edgefield delayed treatment or misdiagnosed Plaintiff's right great toe, and that to the contrary, the evidence clearly shows Plaintiff was provided timely, proper, and adequate medical care for his right great toe wound. Dr. Blocker attests that the initial management of diabetic foot infections is early empiric antibiotic therapy, combined with surgical debridement and local wound care, in addition to glycemic control and evaluation of vascular insufficiency. Dr. Blocker attests that all of these treatment options were provided to the Plaintiff in an effort to resolve the wound he had acquired, and every attempt was made to avert amputation of Plaintiff's great right toe.

Dr. Blocker further attests that the underlying mechanical, biochemical, and logistical problems that predispose diabetics to foot ulcers and limits their ability to heal cannot be altered to any great extent, and that Plaintiff's continuous and blatant non-compliance with his insulin therapy, his poor diet, and hygine habits resulted in secondary infections to the wound, which in turn



hampered the effectiveness of the antibiotics prescribed to him. Dr. Blocker attests that the chronology of care for Plaintiff's right great toe wound illuminates the fact that the BOP consistently adhered to its duty of reasonable care, that the medical staff at FCI Edgefield exercised ordinary diligence under the circumstances in providing frequent and appropriate medical care specific to Plaintiff's condition, and that there is no evidence that the action or non-action of medical staff at FCI Edgefield caused Plaintiff's right toe to be amputated. Further, following Plaintiff's right toe amputation, the medical records show that Plaintiff was provided with timely, proper, and adequate follow-up medical care. See generally, Blocker Affidavit.

In opposition to the Defendant's motion for summary judgment, Plaintiff has provided an affidavit wherein he also details his medical visits and care received, which essentially follows the chronology of Dr. Blocker's affidavit and the medical records submitted as exhibits by the Defendant. As part of his affidavit, Plaintiff alleges that on May 5, 2013, he was told by a "Nurse Adams" that she believed there was "a major issue with [his] great right toe that is not being properly addressed" due to "in fighting".[5] Plaintiff attests that at another follow-up visit, on May 15, 2013, Nurse Adams saw something that "alarmed her" to the point that she asked for Dr. Blocker and the Nurse Practitioner, but that after they conferred in the hallway Plaintiff was "routinely dismissed", at which time Adams was "visibly upset". Plaintiff complains that thereafter, on May 21, 2013, he was informed by a "Nurse Velez" that his great right toe was "deteriorating", but that although his toe had drainage and emitted an "unbearably foul odor", his wound was "simply cleaned

---

[5] No affidavit or deposition testimony from Adams is provided.



and a new dressing applied".[6]  Plaintiff attests that he thereafter contracted a fever, but that although he was in persistent pain, that "nothing [was] being done".  Plaintiff attests that he was subsequently admitted to the local hospital, where his toe was amputated.

While Plaintiff acknowledges in his affidavit that he is "not a medical doctor", he states that it is his "firm belief . . . that the medical staff at FCI Edgefield, as a whole failed me as a human being".  Plaintiff states that, in his opinion, from the day the institution knew he had a staff infection until the day they changed his medication, there was no adequate testing done and "false" x-rays were performed, all while his condition worsened.  Plaintiff asserts that he was not provided adequate health care, and that there is "no reason I should have suffered through days on end in the extreme amount of pain and discomfort as I did".  See generally, Plaintiff's Affidavit.

Plaintiff has also submitted copies of various documents as exhibits, including purported BOP documents and guidelines dealing with infectious disease management, a fact sheet on diabetes, a definition of osteomyelitis, and copies of BOP health services clinical encounter notes for the Plaintiff for various dates.  See generally, Plaintiff's Exhibits.

**Discussion**

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Rule 56, Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991).

---

[6] No affidavit or deposition testimony from Valez is provided.



Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence presented, the undersigned finds for the reasons set forth hereinbelow that the Defendant is entitled to summary judgment in this case.

## I.

The FTCA waives sovereign immunity and allows suits against the United States for personal injuries caused by government employees acting within the scope of their employment. Under this Act, a plaintiff may recover a monetary award from the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope...of employment." 28 U.S.C. § 1346(b). This includes claims under the FTCA for medical malpractice. See Littlepaige v. United States, 528 Fed.Appx. 289, 291-292 (4th Cir. 2013).[7] Of particular importance to the claim asserted here, whether any government employee

---

[7]Medical malpractice is a category of negligence, but differs from a claim of ordinary negligence. Cf. Dawkins v. Union Hosp. Dist., 758 S.E.2d 501, 503-504 (S.C. 2014) [Distinguishing between claims of medical malpractice and ordinary negligence]. Plaintiff's claim here is obviously one for medical malpractice, not for ordinary negligence, because it involves the alleged "failure of [medical professionals] to exercise that degree of care and skill that is ordinarily employed by the
(continued...)



was negligent is to be determined "in accordance with the law of the place where the act or omission occurred," here the State of South Carolina. 28 U.S.C. § 1346(b)(1). To establish a cause of action for medical malpractice in South Carolina, a plaintiff must prove the following facts by a preponderance of the evidence:

> (1) The presence of a doctor-patient relationship between the parties;
>
> (2) Recognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;
>
> (3) The medical or health professional's negligence, deviating from generally accepted standards, practices, and procedures;
>
> (4) Such negligence being a proximate cause of the plaintiff's injury; and
>
> (5) An injury to the plaintiff.

See Brouwer v. Sisters of Charity Providence Hospitals, 763 S.E.2d 200, 203 (S.C. 2014)(citing 27 S.C. Jur. Med. & Health Prof'ls § 10 (2014) (footnotes omitted); Smith v. United States, 119 F. Supp. 2d 561 (D.S.C. 2000)).

Additionally, as the Defendant correctly notes in its brief, in order to pursue a malpractice claim in South Carolina a plaintiff is first required to file "as part of the complaint an affidavit of an expert witness which must specify at least one negligent act or omission claimed to exist and the factual basis for each claim . . . .". See S.C. Code Ann. § 15-36-100. A failure to file such an affidavit with the Complaint requires dismissal of the case in state court. See Rotureau v.

---

[7](...continued)
profession under similar conditions and in like surrounding circumstances". Turbeville v. Wilson, No. 05-517, 2005 WL 7084352, at * 3 (S.C. Ct. App. Sept. 12, 2005) [Setting forth definition of a medical malpractice claim in South Carolina].



Chaplin, No. 09-1388, 2009 WL 5195968, at * 6 (D.S.C. Dec. 21, 2009).  Although Plaintiff's claim has been filed in federal court under the FTCA, and not in state court, the filing of such an affidavit is nevertheless a mandatory prerequisite to the filing of a malpractice claim against the United States under the FTCA in this District.  See Chappie v. United States, No. 13-1790, 2014 WL 3615384 at * * 1, 5 (D.S.C. July 21, 2014); Jelks v. United States, No. 12-3451, 2014 WL 1096301 at * 3 (D.S.C. Mar. 19, 2014); Millmine v. Harris, No. 10-1595, 2011 WL 317643 (D.S.C. Jan. 31, 2011) [Holding that pre-suit notice and expert affidavit requirements in S.C. Code Ann. § 15-36-100 and 15-79-125 are the substantive law in South Carolina]; Oakman v. Lincare, Inc., No. 13-428, 2013 WL 3549848 (D.S.C. July 10, 2013).

Therefore, this case is subject to dismissal because Plaintiff did not file the requied expert affidavit with his Complaint.  Jelks, 2014 WL 1096301, at * 3 [Before filing or initiating a claim for medical malpractice in South Carolina, a plaintiff must contemporaneously file a "notice of intent to file suit" and expert affidavit which identifies at least one negligent act or omission claimed to exist].

## II.

Plaintiff correctly points out that there is a "common knowledge" exception to the affidavit requirement, which applies where the claim "is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct." Brouwer, 763 S.E.2d at 203-204 (citing Carver v. Med. Soc'y of S.C., 334 S.E.2d at 125, 127 (S.C.Ct.App. 1985)).  This occurs where "the defendant's [alleged] careless acts are quite obvious, [such that] the plaintiff need not present expert testimony to establish the standard of care." Brouwer, 763 S.E.2d at 204.  While Plaintiff argues that the "common knowledge" exception should apply to his claim, this exception

14



would not apply here, as the gravamen of Plaintiff's claim is that he did not receive proper medical care and attention for a chronic condition both prior to and during surgery and also with respect to his subsequent care. See Complaint. It is self evident that Plaintiff would need to present "expert testimony to establish the standard of care" for such claim. Brouwer, 763 S.E.2d at 203-204.

### III.

Finally, even if Plaintiff's claim *was* entitled to proceed without an expert affidavit (which it is not), the Defendant would still be entitled to summary judgment. While Plaintiff's statements in his affidavit and Complaint certainly establish that he was not satisfied with the medical care and treatment he received, that is all they establish, that Plaintiff does not personally believe he received proper medical care and treatment for his toe. However, Plaintiff's own lay opinion that the medical care and treatment he received was improper and constituted malpractice is not itself competent *evidence* to support such a claim. Luckett v. United States, No. 08-13775, 2009 WL 1856417 at * 5 (E.D.Mich. June 29, 2009) (citing Lambert v. United States, 198 Fed.Appx. 835, 839 (11th Cir. 2006)[affirming dismissal of medical malpractice claim under FTCA where Plaintiff submitted only "his own conclusory allegations."]); cf. Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]).

Rather, to proceed with a medical malpractice claim in South Carolina, Plaintiff must have actual *evidence* sufficient (for purposes of summary judgment) to create a genuine issue of fact that a physician or medical personnel negligently deviated from recognized and generally accepted standards, practices, and procedures with respect to his condition which would have been exercised

15



by competent physicians in the same specialty under similar circumstances, and that such negligent deviation from this accepted standard of care proximately caused an injury to the Plaintiff. Dumont v. United States, 80 F.Supp.2d 576, 581 (D.S.C. 2000); Liebsack v. United States, 731 F.3d 850, 854-856 (9th Cir. 2013) [Applying state statute requiring specialized expert testimony in medical malpractice cases to a FTCA action]; Suggs v. United States, 199 Fed.Appx. 804, 807-808 (11th Cir. 2006) [Applying state law for medical malpractice claim in the analysis of a FTCA claim and finding "[a] plaintiff may not rely on his own statements and lay opinions to avoid summary judgment."]. In meeting this standard, Plaintiff bears the burden of establishing by expert testimony both the "standard of care and the Defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the Defendant's conduct". Martasin v. Hilton Head Health Systems, 613 S.E.2d 795, 799 (S.C.Ct.App. 2005), citing Gooding v. St. Francis Xavier Hospital, 487 S.E.2d 596, 599 (S.C. 1997).

Plaintiff has failed to meet this standard, as he has provided no evidence to support his own general and conclusory assertions in his Complaint and affidavit that the care prison officials provided to him was not "reasonable care" under the circumstances. None of Plaintiff's exhibits establish that any medical provider committed medical malpractice (as noted, Plaintiff's own lay opinion as to what type of care and treatment he should have been provided cannot establish his claim) while, conversely, the Defendant has provided substantial medical documentation showing that Plaintiff received regular and ongoing care for his complaints as well as an affidavit from a licensed physician attesting that Plaintiff received proper and reasonable care for his condition. In contrast to this medical evidence, other than his own conclusory and self serving speculation, Plaintiff has presented no *medical* evidence whatsoever to show that the medical care he received

16



during the relevant time period was in any way improper. Specifically, Plaintiff has presented no evidence, such as affidavits from other medical professionals or any other type of medical evidence, to show negligence or medical malpractice with respect to his care or to otherwise support his claim. Luckett, 2009 WL 1856417 at * 5 (citing Lambert, 198 Fed.Appx. at 839 [affirming dismissal of medical malpractice claim under FTCA where Plaintiff submitted only "his own conclusory allegations."]; Dumont, 80 F.Supp.2d at 581 [In order to establish a medical malpractice claim, the Plaintiff has the burden of proving by a preponderance of the evidence that the physician or medical personnel negligently deviated from the recognized and generally accepted standards, practices, and procedures in the community which would be exercised by competent physicians in the same specialty under similar circumstances, resulting in injuries to the Plaintiff].

        In sum, after review of the evidence and arguments submitted to this Court in the light most favorable to the Plaintiff, the undersigned does not find that Plaintiff has presented a sufficient issue of material fact as to whether prison officials failed to exercise "ordinary diligence under the circumstances" with respect to his medical care. Nothing in the medical evidence provided to this Court supports Plaintiff's negligence claim, and his failure to provide any such evidence is fatal to his claim. Martasin, 613 S.E.2d at 799 [Plaintiff bears the burden of establishing by expert testimony the Defendant's failure to conform to the required standard of care]; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [plaintiff's conclusory allegations insufficient to maintain claim]. The Defendant United States is therefore entitled to summary judgment on this claim. Eickhoff v. Beard-Laney, 20 S.E.2d 153, 156 (S.C. 1942) [a plaintiff is required to show negligence with reasonable certainty, and not through mere conjecture]; see Papasan v. Allain, 478 U.S. 265, 286 (1986) [courts need not assume the truth of legal conclusions couched as factual



allegations]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["even though pro se litigants are held to less stringent pleading standards then attorneys, the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"].

## Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 14, 2016
Charleston, South Carolina





**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).